# THE STATE OF FLORIDA EX REL. THE PERUVIAN PHOSPHATE COMPANY, PLAINTIFF, VS. THE BOARD OF PHOSPHATE COMMISSIONERS, DEFENDANTS.

1. The act of June 9th, 1891, Chapter 4043, relating to the phosphate interests of the State, asserts an absolute right of property .upon the part of the State in the phosphates lying in the beds of her navigable waters, and the exclusive dominion of the State over the same. Its theory and policy are inconsistent with a property right or ownership therein by others, either under the riparian act (Sections 454, 455, Rev. Stat.), or otherwise.

2. An application by a party to the Board· of Phosphate Commissioners for a contract under the statute relating to the phosphate interests of the State, and the institution of a judicial proceeding to enforce an. alleged preference under the provisions of such statute, are admissions of the jurisdiction of the board and of the property rights of the State as to the phosphate interests involved.

3. The concession made by the State of the right to dig, mine and remove the phosphates lying under the navigable waters of the State is not absolute, but purely conditional. The conditions are, that one desiring to engage in the business shall enter into a contract with the Board of Phosphate Commissioners, as contemplated by the statute.

4. The Legislature in the exercise of its asserted power to concede the right to take phosphates lying in the beds of navigable waters, has made no discrimination between persons, except to provide that "preference" shall be given to riparian owners, and to those who may have commenced mining or preparing to mine prior to the passage of the act. This preference is a mere priority of opportunity for the preferred parties to engage in the business of digging, mining and removing phosphates from the beds of navigable waters, under the terms and

. conditions of the act, if they desire to do so. The "preference" is not assignable as such, or independent of the riparian ownership.

5. A riparian owner, within the meaning of the statute of June 9, 1891, relating to the phosphate interests of the State, executed a deed purporting to grant and convey to certain parties the perpetual and exclusive right to dig, mine and remove the phosphates lying in navigable waters bordering on his land, and such grantees executed a deed purporting to assign to relator the same rights and easements: *Held*, That these deeds did not vest in the relator the preference which the statute gave the riparian owner.

Original proceeding—Mandamus.

### STATEMENT.

The alternative writ shows, in substance, that the relator is a body corporate under the laws of this State, organized in June, 1891, for the purpose of digging, mining and preparing for market phosphate rock and phosphatic deposits. That at the time of commencing to do business, or soon thereafter, it acquired from the former owners an easement in certain of the land bordering on the Alafia river, a navigable stream in Hillsborough county, to dig, mine, and remove the phosphate rock and phosphatic deposits therefrom, which easement also included all the right of such former owners in the phosphate rock and phosphatic deposits lying in the bed of said Alafia river adjacent or opposite to said parcels of land.

That one J. H. Patterson, of said county, was on and before January 10, 1891, the owner in fee of a cer-

tain parcel of land bordering on said river, and described as "lot 2, in section 19, t. 30, s., r. 20 e., except that portion owned by D. C. Walker," the said tract having a frontage of about 40 rods or more on said river; and that on said day Patterson transferred and conveyed by deed to George R. Boaz and William T. Roberts, as co-partners under the firm name of the Peruvian Phosphate Company, their heirs and assigns, "the perpetual and exclusive right to dig, mine, and remove any and all phosphate rock, phos phatic deposits, or other mineral substances which might lie and be in the beds of streams and bayous included within or bordering on" said above described portion of said lot No. 2, such "easement being intended to include rights in all bayous along said water front, and to extend up to the most northerly or main banks of said land," the same lying and being in said county and State, and said easement "being absolute and irrevocable."

That said Roberts and Boaz were then mining phosphate rock and phosphatic deposits in the bed of said Alafia river, and so continued to do until their conveyance to the relator, as hereinafter set forth. That on or about June 30, 1891, Roberts and Boaz conveyed to relator all the property rights, and all rights of every kind, which they had acquired by reason of carrying on the mining and removing of phosphate rock and phosphatic deposits from said river previous to that time, and at the same time transferred and conveyed by deed to relator all their right, title, and in-

terest in and to certain lands owned by them bordering on said river, including the said portion of said lot 2, and their perpetual and exclusive right to mine phosphate rock and phosphatic deposits in the part of said river bordering thereon; and relator has ever since remained, and is still, the owner of all said rights, and especially of their right in the said described portion of said lot 2.

That the Legislature at its session in the year 1891, passed an act approved June 9, 1891, (and, we may remark, taking effect the same day), the same being Chapter 4043 of the laws, and thereby the State granted to persons, natural or corporate, the right to dig, mine and remove from the beds of the navigable waters of the State any and all phosphate rock and phosphatic deposits therein upon certain terms and conditions in said act specified; and that by said act the Governor, Comptroller, and Attorney-General were constituted a board of Phosphate Commissioners to have the control and management of the phosphate interests of the State in the beds of her navigable waters, and that said board was thereby authorized in behalf of the State to enter into contracts with all persons desiring to avail themselves of the provisions of said act in conformity therewith for the exclusive right to dig, mine, and remove phosphate rock and phosphatic deposits from the beds of said navigable waters within certain well-defined limits, for a period not to exceed five years, but that in granting such

36

rights such board should give preference to riparian owners, and also to those who may have commenced mining or preparing to mine prior to the passage of the act.

That within the time prescribed by the act the relator presented its petition to said board, representing that relator had complied with all the conditions of said act, and with the regulations and requirements promulgated by said board, and was ready to comply with all such as should be required of it thereafter in accordance with the terms of the statute; and that relator was a riparian owner as regards the said portion of said lot 2, and that it and its grantors had commenced to mine prior to the passage of said act, and were the only parties who had so mined phosphate rock and phosphatic deposits in said river prior to the passage of said act; and that it was then prepared to continue the mining thereof under contract with said board, acting in behalf of the State; and praying such board to enter into contract with it, under the provisions of the act, giving it the exclusive right to mine said phosphate rock and phosphatic deposits in certain portions of the bed of said river, including the portion adjacent to and bordering upon said portion of said lot 2, the portions of the bed of said river petitioned for being much less than 10 miles in extent by the course of said stream, and being only those portions in which relator had riparian rights.

That all the representations of said petition were true, and that the board, in the first instance, awarded

relator the exclusive right to dig, mine and remove phosphate rock and phosphatic deposits from all the beds of said river described and included in its petition; and relying upon such award, it expended several thousand dollars in enlarging its capacity for the preparation of phosphate rock for the market, and for carrying out its said expected contract with the State; but that, before the contract with the board and relator was executed and delivered, the board rescinded said award, and denied to relator any right to dig or mine such rock and deposits in that portion of the beds of said river adjacent to the part of said lot 2, hereinbefore described. That such refusal was not based on any failure of relator to comply with any of the rules and regulations promulgated by said board or any provision of said statute, but upon a claim of right to award said beds to other parties, who made no claim of riparian ownership, and who had not commenced mining or acquired the right of any person who had so commenced prior to the passage of said act.

That any such contract made by the board after the due filing with it of said petition, and the relator's compliance with all requirements of the board, would be wholly null, void, and of no effect, and that the said right to mine such rock and deposits in the bed of said river adjacent to the said described part of lot 2 as aforesaid is of great value, to-wit: of the value of $10,000 or more; and that said river above, below and opposite said lot 2 is a navigable stream, and the bed

thereof at said point is a part of the territory which the board was authorized to lease, and the right to obtain a contract for was given to the riparian owner by the provisions of said statute.

That the board after the application of relator for a contract was made to it as aforesaid, made advertisement, stating that application had been made for rights in the bed of said river under the provisions of said act, and calling upon all other parties who desired to make application for rights thereunder to appear before it. That in response to such notice no one appeared before the board or made application for a contract to dig, mine or remove phosphate rock and phosphatic deposits from said portion of lot 2, before described, under the provisions of said act, who claimed either to be a riparian owner or to have commenced mining or preparing to mine prior to the passage of said act.

That the board is composed of Henry L. Mitchell, Governor, William D. Bloxham, Comptroller, and William B. Lamar, Attorney-General, of the State.

The command of the writ is that the defendants, as the Board of Phosphate Commissioners of the State of Florida, forthwith award to the relator the exclusive right to dig, mine, and remove phosphate rock and phosphatic deposits from the bed of the Alafia river, adjacent to and bordering upon said tract of land described as "all of lot 2, s. 19, t. 30 s., r. 20 e., except that portion owned by D. C. Walker," said tract described having a frontage on said river of about 40

rods or more, and that they execute a contract with the relator therefor upon its compliance with the provisions of said statute, and such provisions as defendants, as such board, may be authorized to make in the premises; or that cause be shown, etc.

To this writ the Governor, Comptroller, and Attorney-General have made return, and, after averring that the facts recited by the relator do not entitle it to mandamus, set up facts by way of defense which, in view of the conclusions reached, it is unnecessary to state.

*N. B. K. Pettingill* for Plaintiff.

*The Attorney-General* for Defendant.

RANEY, C. J. :

This case has been submitted on the alternative writ and the return.

The statute (Chapter 4043) approved and taking effect June 9, 1891, regulating the phosphate interests of the State, constitutes the Governor, Comptroller and Attorney-General a Board of Phosphate Commissioners, and gives them the control and management of such interests of the State in the beds' of her navigable waters, and of all phosphate rock and phosphatic deposits therein, and authorizes the board to enter into contracts with all persons desiring to avail themselves of the provisions of the statute, in conformity therewith, and to take such means as may be necessary to

collect all sums due or to become due to the State on account of such rock or deposits dug, mined or removed from the beds of such navigable waters. By the second section the State "grants the right to persons, natural or corporate, to dig, mine and remove from the beds of navigable waters any and all such rock and deposits therein, upon the terms and conditions as follows:" At stated prices per ton, regulated according to the percentage of bone phosphate of lime; an account of the quantity dug, mined or removed to be rendered quarterly to the board, and payment to be made quarterly to the State treasury; it being provided, however, that no person or persons shall be permitted to dig, mine or remove any such rock or deposits from the bed of any navigable water until he or they shall have first entered into a contract with the board in conformity with the provisions of the act, and shall file with the board a bond, with good and sufficient sureties, either personal or by guaranty company, to be approved by the board, in such sum as the board shall deem proper, conditioned to comply with the terms of the contract and the provisions of this act. The board (Section 3) are "authorized" to "give or contract" for the exclusive right to dig, mine and remove such rock and deposits from the bed of navigable waters "within certain well-defined limits, and for a period not to exceed five years," the statute declaring that in granting such rights the board shall require that the person or persons, company or com-

panies, shall begin mining within six months from the date of the contract, and that such mining shall be continued for the full term of the contract, unless the phosphate or phosphatic deposits be exhausted; and that "the board shall give preference to riparian owners; also to those who have commenced mining or preparing to mine prior to the passage of this act; but riparian owners and persons having commenced mining or preparing in good faith to mine and remove such phosphates shall make application for a contract, and file his or her or their bond, as herein provided, within sixty days from the date of notice that any application has been made in good faith by others for such contract, which notice shall be given by the board;" it being provided, however, that "such contracts shall in no case exceed ten miles by the course of said stream," and that the provisions of the act shall not be construed "as applying in cases of navigable streams or any part thereof that is not meandered, and the ownership of the lands embracing which is vested in a legal purchaser."

The act (Section 4) also provides for the appointment of an inspector of phosphates by the board, whose duties are prescribed, and who is to act "as the executive officer" of the board; and (Section 5) that any one who digs, mines or removes any such rock or deposits from the bed of any such waters shall be guilty of a misdemeanor, and, upon conviction, shall be punished as prescribed; it being declared, however, that the penal provisions are not to apply to persons

mining under a *bona fide* claim of ownership of such deposits. Authority is also given the board to sue and employ counsel to protect and enforce the rights of the State, (Section 6); and Section 7 repeals all laws in conflict with the provisions of the statute.

This statute asserts the State's absolute right of property in the phosphates in the beds of her navigable waters, and her exclusive dominion over the same. State vs. Black River Phosphate Co., 27 Fla., 276, 9 South. Rep., 205. Its theory and policy are inconsistent with a property right or ownership therein by others, either under the riparian act of 1856 (Sections 454, 455, Rev. Stat.) or otherwise. The alternative writ recognizes expressly the navigability of the Alafia river; and the relator's application to the Board of Phosphate Commissioners for a contract, as well as its institution of this judicial proceeding, are admissious of the jurisdiction of the board and the property rights of the State over the phosphate interest in dispute. The purpose of the writ is to have us require the commissioners to perform their statutory duties in the premises. The Attorney-General, relying upon the case of State *ex rel.* Dixon vs. Trustees I. I. Fund, 20 Fla., 402, contends that mandamus does not obtain, because of the final consummation of the contract between the board and the Tampa Phosphate Company, whereby, it is claimed, the exclusive right to mine, dig and remove the phosphates to be found in the disputed territory has been given to the company, and has passed from the State to the company for the

period and on the terms and conditions stated in that contract. We, however, shall not consider this question of remedy, but, passing it *sub silentio*, will dispose of the case upon questions affecting the rights of the relator as shown by the pleadings.

The ground upon which the relator rests its claim to priority and relief is that it occupies, as to the disputed territory, the status which the State gives to a riparian owner. In this it is mistaken. The statute does not concede to riparian owners any property interests in the phosphate deposits beyond high-water mark, or in the beds of navigable waters. Instead of of recognizing in riparian owners any property interest which is the subject of sale or transfer in or as to the phosphate itself below high-water mark, or the mining, digging or removal thereof, the statute asserts the State's exclusive property, control and management in and over the same; and the Legislature, in the exercise of its power, unquestioned here, to concede the right to take these phosphates, has made no discrimination between persons, except that it has provided that a "preference" shall be given to riparian owners, and to those who may have commenced mining or preparing to mine prior to the passage of the act. The nature of this preference is to be ascertained from provisions of the statute. Assuming itself to be the owner of these deposits, and that no one, whether a riparian owner or other, has the right to

disturb them without its permission and on such terms as it may see fit to prescribe, the State has granted to all persons, natural or corporate, the right to dig, mine and remove the same. This concession is not absolute; on the contrary, is purely conditional. These conditions are that any one desiring to engage in the business must, as a precedent to the exercise of such concession or "right," enter into a contract with the Board of Phosphate Commissioners, to whom has been given the control and management of the phosphate interests of the State, and give bond, with surety, in such sum as the board may deem proper, conditioned to comply with the terms of the contract and the provisions of the act. The statute also prescribes the prices per ton to be paid for the several designated grades of phosphate, and authorizes the board to give or contract for the exclusive right to dig, mine and remove phosphates in certain defined limits, not to exceed in any case ten miles by the course of the stream, and for a period not to exceed five years; and in each case the company, person or persons contracting are to begin mining within six months from the date of its contract, and such mining is to be continued the full term of the contract, unless the phosphate in the specified territory shall be exhausted. The only discrimination which the board is authorized to make, or which the statute recognizes as allowable, between "persons, natural or corporate," who may desire to enter into such contract, is defined as fol-

lows: "The board shall give preference to riparian
owners; also to those who may have commenced min-
ing or preparing to mine prior to the passage of this
act; but riparian owners and persons having com-
menced mining or preparing in good faith to mine and
remove such phosphates shall make application for a
contract, and file his or their bond, as herein provided,
within sixty days from the date of notice that any ap-
plication has been made in good faith by others for
such contract, which notice shall be given by the Board
of Phosphate Commissioners." The preference which
a riparian owner, or one who, prior to the act, had
commenced mining or preparing in good faith to mine,
is accorded over others, is the mere priority of oppor-
tunity to engage in the business of digging, mining
and removing phosphates under the terms and condi-
tions of the act, if they desire to do so; and the pur-
pose of the act in requiring the stated notice is that
they shall have the opportunity of entering into a con-
tract with the board under the statute, whenever
others make application in good faith to mine, dig or
remove phosphates opposite the land of a riparian
owner, or at the place or in the territory where, prior
to the statute, such pioneer operators had commenced
mining or preparing in good faith to mine. To a ripar-
ian owner or pioneer operator who does not desire to
go into this phosphate business, and does not, upon
receiving the stated notice, enter into a contract and
give bond within the time and in the manner contem-

plated by the act, the statute gives no preference or priority over others. A failure to take advantage of the opportunity thus offered forfeits forever the preference which has been accorded to the riparian ownership or to pioneers. No other priority or preference can be extracted from the law, nor is any one but a riparian owner, and those whom we have designated as "pioneer operators," within the preferred class.

The relator's title to the status of a riparian owner has the following basis: On January 10, 1891, one Joseph H. Patterson, who is alleged to have owned all of lot 2, in section 19, township 30 S., range 20 E., in Hillsborough county, except an undefined portion owned by one D. C. Walker, said tract having a frontage on the Alafia river of about 40 rods or more, executed a deed which purports to grant, bargain, sell, and convey to George R. Boaz and William T. Roberts, copartners as the Peruvian Phosphate Company, the perpetual and exclusive right to dig, mine and remove any and all phosphate rocks, phosphatic deposits, and other mineral substances which may lie and be in the beds of streams and bayous included within or bordering on said land; "such easement being intended to include rights in all bayous along said water front, and to extend up to the most northerly or main banks of said land." On June 13, 1891, the grantees in the foregoing deed executed a deed purporting to grant, bargain, sell, and convey to relator the same perpetual rights and easements.

The effect which it is here sought to give these instruments is that the former vested in Boaz and Roberts, copartners aforesaid, the preference which the statute gives to riparian owners, and that the latter transferred this preferred status to the relator. In our judgment, they have no such effect. Patterson's deed may amount to a waiver. as between him and Boaz and Roberts and their assigns, or generally, of any claim to the preference accorded by the statute to him as a riparian owner, but it had no effect to create any preference in Boaz and Roberts, or their assigns, against any one else, or to limit the discretion of the Board of Phosphate Commissioners in any way. It was not the purpose of the statute to vest a riparian owner with the power of conferring on others a preference or privilege to do what he did not wish to do himself, and the same observation is true of pioneer operators. The statute has limited the preference to riparian owners themselves, and the attempt at assignment predicated on these deeds is futile. Whether or not a consummated contract would be assignable if the contract did not contain the provision that the rights granted shall not be sublet without the consent of the Board of Phosphate Commissioners, it is not necessary or proper to decide. As the case stands, the relator was not a riparian owner at any time mentioned in the record, and has never been entitled to the preference which the statute accords to this class of persons; and, as the case made by the alternative

writ and urged by counsel for relator is upon the theory of riparian ownership, a peremptory writ must be denied.

There will be judgment accordingly for defendants.