, [S. F. No. 12707. In Bank.—December 31, 1928.]

K. E. BOONE, Petitioner, v. W. S. KINGSBURY, Surveyor-General, etc., Respondent.

[S. F. No. 12708. In Bank.—December 31, 1928.]

H. E. SHUDDE, Petitioner, v. W. S. KINGSBURY, Surveyor-General, etc., Respondent; HARRY A. CHAMBERLIN, Intervener.

[S. F. No. 12728. In Bank.—December 31, 1928.]

CHARLES M. WORKMAN, Petitioner, v. W. S. KINGSBURY, Surveyor-General, etc., Respondent.

[S. F. No. 12729. In Bank.—December 31, 1928.]

HICKEY BROTHERS COMPANY et al., Petitioners, v. W. S. KINGSBURY, Surveyor-General, etc., Respondent.

[S. F. No. 12730. In Bank.—December 31, 1928.]

R. W. HARTHORN et al., Petitioners, v. W. S. KINGSBURY, Surveyor-General, etc., Respondent.

[S. F. No. 12743. In Bank.—December 31, 1928.]

HARRY A. CHAMBERLIN, Petitioner, v. W. S. KINGSBURY, Surveyor-General, etc., Respondent.

[S. F. No. 12766. In Bank.—December 31, 1928.]

KITTIE C. BALLARD et al., v. W. S. KINGSBURY, Surveyor-General, etc., Respondent; WILBUR B. FINCH, Intervener.

Faries & Williamson, David R. Faries, Frederick W. Williamson, Edwin Heizman and McIntyre Faries for Petitioners K. E. Boone and H. E. Shudde.

A. L. Weil, Morrison, Hohfeld, Foerster, Shuman & Clark, Roy Maggart, Geo. B. Bush, Thomas A. Joyner and Philip C. Farman, *Amici Curiae* in Support of Petitioners K. E. Boone and H. E. Shudde.

Harry A. Chamberlin, *in pro. per.*

Jerry H. Powell, Paul M. Gregg and Arthur W. Eckman for Petitioners Hickey Brothers Company and R. W. and Thelma I. Harthorn.

Clarke & Bowker and James C. Hollingsworth for Petitioner Charles M. Workman.

Robertson & Crawford, Clarke & Bowker and Thompson & Robertson for Petitioners Kittie C. Ballard et al.

U. S. Webb, Attorney-General, for Respondent.

Flint & Mackay, Frank P. Flint, Arthur R. Smiley, Alexander T. Sokolow and E. W. Miller, *Amici Curiae* in Support of Respondent.

Faries & Williamson and David R. Faries for Intervener Wilbur B. Finch.

SEAWELL, J.—Original applications for writs of *mandamus* by which the validity of chapter 303, Statutes and Amendments of 1921, page 404, and certain specific sections

thereof, and also chapter 285, Statutes and Amendments of 1923, page 593, amendatory of said chapter 303, which provides for the granting of permits to residents of the state who are citizens of the United States, to enter and prospect upon tidal and submerged lands and to lease the same on a royalty basis, is assailed.

All of the petitioners herein are applicants for permits to enter and prospect for oil, oil shale, gas, phosphate, sodium and other mineral deposits upon the several areas of public lands described in each respective application. Said lands are tidal and submerged lands situate in the vicinity of a small cove of the Pacific Ocean at Seacliff, county of Ventura, this state. Respondent, W. S. Kingsbury, surveyor-general of the state of California and *ex-officio* register of the state land office, has refused to grant the permits applied for, basing his refusal to do so upon the ground that the granting of the same would authorize the conduct of a business in and upon tidal and submerged lands which would interfere with and be destructive of navigation and the fisheries in the proximity of and within the areas described in said applications, and that the legislature, in adopting the statute purporting to authorize the granting of said permits, exceeded its authority in attempting to provide a method by which tidal and submerged lands held by the state in trust for its inhabitants by virtue of its sovereign right and not by its proprietary right may be leased to residents of this state who are citizens of the United States or who have declared their intention to become citizens. The title of said chapter 303, Statutes and Amendments of 1921, is as follows: ''An act to reserve all minerals in state lands; to provide for examination, classification and report on the mineral and other character of state lands; to provide for the granting of permits and leases to prospect for and take any such minerals; to provide for the rents and royalties to be paid, and granting certain preference rights; to provide for the making of rules, regulations and contracts necessary to carry out the purposes of this act; and repealing acts or parts of acts in conflict herewith; providing for an appropriation to defray the cost of administering this act.''

By the provisions of said act all coal, oil, oil shale, gas, phosphates, sodium and other mineral deposits in lands belonging to the state are reserved to the state and are

reserved from sale except upon a rental and royalty basis, and a purchaser of any lands belonging to the state or which may thereafter become the property of the state shall acquire no right, title or interest in or to such deposits except as in said act expressly provided. The right of such purchaser shall be subject to the reservation of said coal, oil, oil shale, etc., and to the conditions and limitations prescribed by law for the state and persons authorized by it to prospect for, mine and remove such deposits and to occupy and use so much of the surface of said land as may be required for all purposes reasonably extending to the mining and removal of such deposits therefrom. All applications to purchase state lands filed subsequent to the passage of the act and all sales are made subject to a reservation to the state of one-sixteenth of all the coal, oil, gas and other mineral deposits in all lands so acquired. The surveyor-general is authorized to classify from time to time any or all state land for its different possible values and uses, and is authorized, upon payment to him of fifty cents per acre for each acre embraced within the boundaries of the lands proposed to be prospected, and under such *rules* and *regulations* as he may *prescribe,* to grant any person or association of persons who are qualified under the citizenship clause, or corporations, ninety per cent of whose stockholders are likewise qualified under said citizenship clause, a prospecting permit, which shall give the exclusive right, for a period not exceeding two years, to prospect for oil or gas, not exceeding 640 acres of land wherein such deposits of oil or gas belong to the state and are not within any known geological structure of a producing oil or gas field, upon condition that the permittee shall begin drilling operations within six months from the date of the permit and shall prosecute said drilling to depths and subject to certain conditions therein required, unless for the causes therein named he is excused from so doing, which are not material to the issues before us. The said act provides that the applicant shall locate such land in a reasonably compact form according to the legal subdivisions of the public land surveys, if the land be surveyed, and in an approximate square or rectangular tract if unsurveyed, said surveying to be at the expense of the applicant. In case of prospecting permits and' leases to river beds, lake beds, overflowed, tide and sub-

merged lands, the width or length of the prospecting permit or lease along the shore line is prescribed. If the applicant shall cause to be erected upon the land for which a permit is sought a monument not less than four feet high at some conspicuous place thereon and shall post a notice in writing on or near said monument, stating that an application for a permit will be made within thirty days after the date of posting said notice, giving the name of the applicant, the date of the notice and general description of land covered by such permit, by reference to courses and distances from such monument and such other natural objects and permanent monuments as will reasonably identify the land, stating the amount thereof, in acres, he shall, during the period of thirty days following such marking and posting, be entitled to a preference right over others to a permit for the land so identified; provided, that such applicant shall, as a part of his application for a permit, show that within two days after the posting of the said notice he recorded a copy of the same in the county recorder's office of the county in which the said land is situated. Within ninety days after receiving a permit the appellant shall mark upon the ground each of the corners of the tract described in the permit with substantial monuments, so that the boundaries can be readily traced on the ground, and shall post in a conspicuous place upon the lands a notice that such permit has been granted and a description of the lands covered thereby. Where the boundaries sought to be prospected or developed are wholly or partially in river-beds, lake-beds, overflowed, tide and submerged lands, the notice shall be conspicuously posted on a monument as closely to a corner of the land as possible, and shall describe the area to be developed by courses and distances, so that the limits of the area can be easily determined. In no case shall permits or leases be granted covering tide, overflowed or submerged lands fronting on an incorporated city or for a distance of one mile on either side thereof. In case of an application for a permit or lease covering tide, overflowed or submerged land by anyone other than the littoral or riparian proprietor, said littoral or riparian proprietor shall have six months within which to file an application for a permit or lease, but if said littoral or riparian proprietor fails to comply with the requirements of said act and its rules and regulations made in pursuance

thereof, his preferential rights shall thereupon cease and be forever terminated and the original applicant shall be permitted to proceed with his application.

Upon establishing to the satisfaction of the surveyor-general that valuable deposits of oil or gas have been discovered within the limits of the land embraced in any permit the permittee shall be entitled to a lease for one-fourth of the land embraced in the prospecting permit, but in any event he shall be granted a lease for as much as 160 acres of said lands, if there be that number of acres within the permit. If the lands are unsurveyed they shall be surveyed by the surveyor-general in accordance with the rules and regulations prescribed by him. Such lease shall be for a period of twenty years upon a royalty basis of five per centum in amount or value of the production and the annual payment in advance of a rental of one dollar per acre. The permittee is given a preferential right to a lease for the remainder of the land in his prospecting permit at a royalty of not less than twelve and one-half per centum in amount or value of the production, under such other conditions as are fixed for oil and gas leases in the act, the bonus and royalty to be determined by competitive bidding or fixed by such other method as the surveyor-general may by regulation prescribe. The surveyor-general is given the right to reject any and all bids. Until the permittee shall apply for a lease to the one-quarter of the permit area he shall pay to the state of California twenty per centum of the gross value of all oil or gas secured by him from the lands embraced within his permit and sold or otherwise disposed of by him or held by him for any disposition whatsoever. All permits and leases of lands shall be subject to the condition that no wells shall be drilled within 200 feet of any of the outer boundaries of the lands described in said permit or lease unless the adjoining lands have been patented or the title thereto otherwise vested in private owners, and to the further condition that the permittee or lessee will, in conducting his explorations and mining operations, use all reasonable precautions to prevent waste of oil or gas developed in the land, or the entrance of water through wells drilled by him to the oil sands or oil-bearing strata to the destruction or injury of the oil deposits. Violations of this

provision of the act work a forfeiture of the permit or lease enforceable by appropriate court proceedings.

Power is given the surveyor-general whenever the average production of any oil-well shall not exceed ten barrels per day to reduce the royalty on future production when in his judgment the well cannot be successfully operated upon the royalty fixed in the lease. Leases shall be for a period of twenty years with the preferential right in the lessee to renew the same for successive periods of ten years upon such reasonable terms and conditions as may be prescribed by the surveyor-general. Section 10 provides, that ''for the purpose of promoting the sale of state land, and the more active co-operation of the owners of the soil, and to facilitate the development of its mineral resources the state hereby constitutes the purchaser of the soil its agent for the purposes herein named and in consideration hereof relinquishes to and vests in the purchaser of state lands an undivided fifteen-sixteenths of all oil and gas and the value of the same that may be upon or within any state land after the passage of this act.'' The purchaser is authorized to sell or lease to any person, firm or corporation the oil and gas and other minerals' that may be thereon or therein upon such terms as such purchaser and owner may deem best, subject to reservations therein contained. Upon the discovery of oil or gas in paying quantities on adjoining lands the purchaser shall within three months thereafter begin the drilling of wells upon his land, which shall be continuous as provided by appropriate rules and regulations prescribed by the surveyor-general. The surveyor-general shall reserve and may exercise the authority to cancel any prospecting permit or lease upon failure by the permittee to exercise due diligence and care in the prosecution of the prospecting work in accordance with the terms and conditions stated in the permit or lease which shall form a part of said instruments. No person, association or corporation shall take or hold more than one oil or gas permit or lease; no corporation shall hold any interest as a stockholder of another corporation in more than one lease and no person or corporation shall take or hold any interest as a member of an association or associations or a stockholder of a corporation or corporations holding a lease under said act which together with the area embraced in any direct holding of a lease, or which

together with any other interest or interests as a member of an association or associations or as a stockholder of a corporation or corporations holding a lease under the provisions of said act for any kind of mineral leased thereunder exceeds in the aggregate an amount equivalent to the maximum number of acres of the respective kinds of minerals allowed to any one lessee under said act. Provision is made for any number of lessees combining their several interests for the purpose of constructing and carrying on the business of a refinery, or of establishing and constructing, as a common carrier, pipe-lines or railroads to be operated and used by them jointly in the transportation of oil from their several wells, or the transportation of coal. Combinations in the form of unlawful trusts or conspiracies in the restraint of trade in the mining or selling of coal, phosphate, oil, shale, gas or sodium are prohibited and the leasehold in such cases is to be declared forfeited to the state. Provision is made for rights of way through all state lands for pipe-line purposes subject to certain regulations. No lease is to be assigned or sublet except with the consent of the surveyor-general. Each lease shall contain provisions for the purpose of insuring the exercise of reasonable diligence, skill and care in the operation of said leased property, and a provision for the safety and welfare of miners and the prevention of undue waste, as may be prescribed by the surveyor-general, including the observance of the eight-hour work day; prohibitions against the employment of any boy under the age of sixteen years or the employment of girls or women in any mine below the surface, restraint against freedom of purchase by employees, compulsory payment of wages at least twice a month, and such provisions as the surveyor-general may deem necessary to insure the sale of the production of said leased lands to the public at reasonable prices, for the protection of the interests of the state, for the prevention of monopoly and for the safeguarding of the public welfare, are made conditions of the lease.

Section 18 and other clauses of said act containing similar language form the basis of the authority assumed by the surveyor-general to enlarge upon the statutory notice required to be given by the applicant of his filing any application for a permit by providing that, in addition to the statutory notice, said applicant shall personally serve littoral

owners, if they can be found within the state, and if they cannot, then by publication in a newspaper of general circulation, much after the manner of serving summons in a civil action. This section is important by reason of the claim advanced by some of the littoral owners—based upon the effectiveness of such a rule as above referred to—that a nonlittoral owner's right to a permit and lease would not be considered if he failed to serve littoral owners with notice, as required by the surveyor-general's rule. Said section 18 provides:

"The Surveyor-General of the state is authorized to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of this act, also to fix and determine the boundary lines of any structure, or oil or gas field, for the purpose of this act."

A preferential right to a permit to prospect mineral lands may, under section 4 of said act, be acquired "If the applicant shall cause to be erected upon the land for which a permit is sought a monument not less than four feet high, at some conspicuous place thereon, and shall post a notice in writing on or near said monument, stating that an application for a permit will be made within thirty days after the date of posting said notice, giving the name of the applicant, the date of the notice, and such a general description of the land to be covered by such permit by reference to courses and distances from such monument and such other natural objects and permanent monuments as will reasonably identify the land, stating the amount thereof in acres, he shall, during the period of thirty days following such marking and posting, be entitled to a preference right over others to a permit for the land so identified; provided, however, that applicant shall, as a part of his application for a permit, show that within two days after the posting of the said notice, he recorded a copy of the same in the county recorder's office of the county in which the said land is situated. The applicant shall, within ninety days after receiving a permit, mark each of the corners of the tract described in the permit upon the ground with substantial monuments, so that the boundaries can be readily traced on the ground, and shall post in a conspicuous place upon the lands a notice that such permit has been granted and a description of the

lands covered thereby; provided, however, that where the boundaries of the land sought to be prospected or developed under leases are wholly or partially in river or lake beds, overflowed, tide and submerged lands, the notice shall be conspicuously posted on a monument as close to a corner of the land as possible and shall specifically describe the area to be developed by courses and distances so that the limits of the area can be easily determined; provided further, however, that in no case shall permits or leases be granted covering tide, overflowed or submerged lands fronting on an incorporated city, or for a distance of one mile on either side thereof; provided further, however, that in case of an application for a permit or a lease covering tide, overflowed or submerged land by anyone other than the littoral or riparian proprietor, said littoral or riparian proprietor shall have six months within which to file an application for a permit or lease, but if said littoral or riparian proprietor fails to comply with the requirements of this act and its rule and regulations made in pursuance hereof, his preferential rights shall thereupon cease and forever be terminated, and the original applicant shall be permitted to proceed with his application.'' The foregoing is all the statute contains on the subject of notice.

Nowhere in the act is the applicant required to personally serve the littoral or riparian owner with notice of the filing of his application for a permit. Under the provisions of the act the only requirement as to notice is that the applicant *post* notice and within two days thereafter record the same in the county recorder's office of the county in which the land is situated, as therein specified. The surveyor-general, assuming to act under the authority conferred upon him by section 18, has, by the adoption of article VII, subsections c, d, e and f, Rules and Regulations, attempted to impose burdens upon the applicant not imposed by statute by requiring personal service of notice, and, under certain circumstances, publication of notice of the filing of an application for a permit.

That a ministerial officer may not, under the guise of a rule and regulation, thought to be necessary to carry out and accomplish the purpose of an act, vary or enlarge the terms or conditions of a legislative enactment has often been the subject of judicial decision. The very authorities cited

by petitioners in support of the particular rule of the surveyor-general now under consideration clearly and definitely indicate that said rule is without and in excess of his jurisdiction. Petitioners cite *Hodgson* v. *Midwest Oil Co.,* 297 Fed. 273, and *Leonard* v. *Lennox,* 181 Fed. 760. In the former of these cases, at page 276 of 297 Fed., it is declared: "While the Leasing Act [30 U. S. C. A., sec. 181 et seq.] itself does not provide for notice, it in effect gives the Interior Department the right to prescribe rules and regulations to carry the act into effect. Such rules and regulations were prescribed by the Land Department requiring notice to be given of all applications for leases, which regulations should be given the full force and effect of statutes, *when not inconsistent with or repugnant to the law itself.*" (Italics supplied.)

The latter case holds that "The power of those officers under the law to adopt such a regulation is not reasonably open to question. Although powerless to adopt a regulation which is in anywise inconsistent with or repugnant to the public land laws, they possess ample power to enforce, by appropriate regulations, every part of those laws, *as to which it is not otherwise specially provided.* (Italics supplied.)

In *United States* v. *George,* 228 U. S. 14, 21 [57 L. Ed. 712, 33 Sup. Ct. Rep. 412, 414, see, also, Rose's U. S. Notes], it is declared: "It is manifest that the regulation adds a requirement which that section does not, and which is not justified by [sec.] 2246. To so construe the latter section is to make it confer unbounded legislative powers. What, indeed, is its limitation? If the Secretary of the Interior may add by regulation one condition, may he not add another? If he may require a witness or witnesses in addition to what [sec.] 2291 requires, why not other conditions, and the disposition of the public lands thus be taken from the legislative branch of the Government and given to the discretion of the Land Department?"

Again, in *Williamson* v. *United States,* 207 U. S. 425, 462 [52 L. Ed. 278, 28 Sup. Ct. Rep. 163, 177, see, also, Rose's U. S. Notes], it is stated: "True it is that in the concluding portion of [sec.] 3 of the timber and stone act it is provided that 'effect shall be given to the foregoing provisions of this act by regulations to be prescribed by the Commissioner of the General Land Office.' But this power

must in the nature of things be construed as authorizing the Commissioner of the General Land Office to adopt rules and regulations for the enforcement of the statute, and cannot be held to have authorized him, by such an exercise of power, to virtually adopt rules and regulations destructive of rights which Congress had conferred.''

*United States* v. *United Verde Copper Co.,* 196 U. S. 207, 215 [49 L. Ed. 449, 25 Sup. Ct. Rep. 222, 225, see, also, Rose's U. S. Notes], holds that ''If rule 7 is valid, the Secretary of the Interior has power to abridge or enlarge the statute at will. If he can define one term, he can another. If he can abridge, he can enlarge. Such power is not regulation; it is legislation. The power of legislation was certainly not intended to be conferred upon the Secretary.''

*Morrill* v. *Jones,* 106 U. S. 466, 467 [27 L. Ed. 267, 1 Sup. Ct. Rep. 423, 424, see, also, Rose's U. S. Notes], declares: ''The Secretary of the Treasury cannot by his regulations alter or amend a revenue law. All he can do is to regulate the mode of proceeding to carry into effect what Congress has enacted. In the present case we are entirely satisfied the regulation acted upon by the collector was in excess of the power of the Secretary. The statute clearly includes animals of all classes. The regulation seeks to confine its operation to animals of 'superior stock.' This is manifestly an attempt to put into the body of the statute a limitation which Congress did not think it necessary to prescribe.''

To the same effect is *Waite* v. *Macy,* 246 U. S. 606, 609, 610 [62 L. Ed. 892, 38 Sup. Ct. Rep. 395, see, also, Rose's U. S. Notes]. In each of the foregoing cases there was provision, as in the act here involved, for the adoption of rules and regulations by a specified officer to carry into effect the purposes of the respective acts. These cases are authority to the effect that so long as the act here under consideration merely requires posting of notice by an applicant the surveyor-general may not, under the guise of a regulation authorized by section 18, require the service of personal notice or the publication of notice. This rule is ineffective and cannot defeat the rights of any of the parties to these proceedings.

All the moneys received by the surveyor-general under the provisions of the act from rents, fees, bonuses and royalties

accruing from the use of state school lands shall be paid into the school fund, and all other moneys shall be deposited in the state general fund.

The act concludes with the provision that, if any section, subsection, sentence, clause or phrase of said act is for any reason held to be unconstitutional, such decision shall not affect the validity of the remaining portions of said act, etc.

■ Prior to the passage of the amendment of section 17, chapter 285, Statutes and Amendments of 1923, littoral or riparian owners, as well as nonlittoral owners, who had entered upon tide, overflowed or submerged lands, were regarded as trespassers. Said amendment relieved littoral owners of the *onus* of trespassers by adding section 17a with respect to their status as follows:

"If any littoral or riparian owner of land, without objection by the State of California, or the United States of America, or any of its officials, shall have entered upon tide, overflowed or submerged land, and for more than ten years next preceding the passage of this act, has been engaged in drilling the same, or has operated thereon, a producing well or producing wells, said littoral or riparian owner shall be entitled to a lease of such portion of such tide, overflowed or submerged land as may be necessary for the drilling of uncompleted wells and for the deepening of wells now producing or now being drilled that may hereafter become a producing well; provided, however, that application therefor shall be made by such littoral or riparian owner within three months after the passage of this act. [June 1, 1923.] Any such lease shall provide for the payment by the lessee of a royalty of twelve and one-half per centum in amount or value of the production. . . . "

This amendment is not open to the objection that the subject is not expressed in its title in compliance with article IV, section 24, state constitution.

■ Without mention of or reference to anything germane to the subject being made in the title of said amendatory act by number or otherwise, section 18a was added to the original act. That section attempts to confer authority upon the surveyor-general with respect to a subject that was not included in the original act. It provides:

"The Surveyor-General is hereby authorized to refuse to grant any permit or lease applied for under the provisions

of this act when in his judgment the work of prospecting for, developing or extracting mineral would cause loss or damage to property near the land applied for.''

The validity of this amendment is attacked on two grounds, first, that it is an attempt to delegate to the surveyor-general, an executive officer, legislative power, the exercise of which is forbidden by the provisions of article III, section 1, and article IV, section 1, state constitution. It is asserted, under the express authority of *Inglin* v. *Hoppin*, 156 Cal. 483 [105 Pac. 582], that ''the granting of state lands is a legislative power and prerogative,'' and that any act which attempts to confer such power upon an executive officer is void; secondly, that the subject of the act is not embraced in its title. This last objection being clearly inescapable, it is not necessary to discuss the first ground of objection. Adopting the most liberal rule of construction, which we must, in the interest of protecting meritorious legislation from being declared void through inartificially drawn statutes (*People* v. *Jordan*, 172 Cal. 391 [156 Pac. 451]; *Estate of Wellings*, 192 Cal. 506 [221 Pac. 628]), it is not possible to save the section from the condemnation of the constitutional provisions cited. The purposes of the provisions of the constitution in the premises are too familiar to lawyer and legislator to justify restatement. The reasons of the rule and its history are elaborately set out in *Ex parte Liddell*, 93 Cal. 633 [29 Pac. 251]. Section 18a, being void, cannot, therefore, be considered in the determination of the rights of any of the parties to this proceeding.

The remaining, and in fact the major law question presented by the case, is pressed by respondent surveyor-general and goes to the validity or effectiveness of the act in so far as it attempts to authorize the leasing of tide and submerged lands to private citizens, or authorizes the holding of said lands in any other use than in trust for a strictly public use. This question will receive attention at a later period in the consideration of the case. The substance of the act having been substantially set out, and its offending section pointed out and the misinterpretation given another by the surveyor-general having already been considered, the conflicting claims of the several petitioners, as shown by the proceedings, will receive attention.

The petitions of the several parties, while constituting separate proceedings, have been treated by the several counsel for petitioners in their briefs as presenting issues and principles of law which are largely, as to the major questions, common to all the causes or proceedings, and a decision of the rights of any one of petitioners will necessarily control to a greater or lesser degree the decision as to the others, except as to the questions of priority of rights or a failure on the part of an applicant to comply with the procedure prescribed by the act. In other words, we understand that it is the desire of all the parties to the several proceedings that all petitions be considered together and that a decision upon the main questions presented, to wit, the validity of said chapter 303, Statutes and Amendments of 1921, and section 18a of said amendatory chapter 285, Statutes and Amendments of 1923, and upon all other questions presented by the pleadings or otherwise arising in which the decision made in one case may be applicable, is to be adopted as the rule of decision in such other cases and is to have the same force and effect in such other proceedings as if separately stated therein. Petitioners stand united as against the main contention of the surveyor-general that the act under which each claims is invalid. Their cross-contentions among themselves are based upon certain provisions of the act, as will fully hereafter appear.

Petitioner Boone, a nonlittoral land owner, was the first one of the group of petitioners to file a petition herein. He alleges that on March 5, 1927, he caused to be erected upon the lands described in his petition a monument upon which he posted a notice in compliance with the requirements of said act; that on March 25, 1927, within the statutory period of thirty days thereafter, he filed an application for a permit to prospect upon said land for oil and gas and paid the $5 filing fee and tendered a bond in the amount fixed by the rules and regulations of the surveyor-general conditioned for the faithful performance of the terms and conditions of the permit, and also tendered fifty cents per acre for each and every acre embraced in the petition for a permit, as required by law. By supplemental petition it is averred that petitioner, subsequent to the filing of the original petition, to wit, October 31, 1927, retendered said fifty cents per acre and said bond in the amount fixed by said surveyor-general,

and that said officer accepted said bond and filed the same in his office, but again refused to accept said tender of money computed at the rate of fifty cents upon each acre of land embraced within the petition. Said sum was deposited by petitioner in a bank of good repute to the credit of said surveyor-general, as provided by section 1500 of the Civil Code, and notice thereof served upon the surveyor-general. By the original petition it is also alleged that since the filing of the application for a prospecting permit more than six months elapsed and no littoral owner or other person applied for or received a permit to prospect the lands described in the petition herein; that petitioner possessed all of the qualifications of citizenship and complied with all of the requirements of said act and all valid rules and regulations prescribed by the surveyor-general and was entitled to a permit to prospect the lands described in his petition; that he was refused such a permit on the sole ground that, in the judgment of respondent surveyor-general, the work of prospecting for, developing or extracting mineral would cause loss or damage to the property near the land described in his application. This alleged reason is founded upon section 18a, which section we have held to be void. It is further alleged, and nowhere pointedly denied, that the lands described in the Boone application were not at any of the times mentioned in said petition within any known geological structure or producing oil and gas field. By a supplemental petition Boone averred that thereafter, to wit, on November 1, 1927, said lands became and have at all times since said day continued to be a part of the known geological structure and that on November 16, 1927, respondent surveyor-general classified and declared all of the tide-lands embraced in the Boone application to be within and a part of said geological structure.

The attorney-general, on behalf of respondent surveyor-general, and the petitioners Charles M. Workman et al. and R. W. and Thelma I. Harthorn et al., whose respective applications include a large portion of the lands described in Boone's application, filed general demurrers to Boone's petition and also filed separate answers and returns to the writ. The surveyor-general, answering Boone's petition, alleged that all of said lands described in the Boone petition ''are situate within a known geological structure of

a producing oil and gas field." This allegation does not traverse the Boone averment as to the time said lands became a known part of such structure. Continuing, it is alleged that a portion of the lands described in the petition are tide-lands lying between the ordinary high and the ordinary low tide lands and the remaining portions are below the line of ordinary low tide, are continuously submerged and form a part of the bed of the ocean and that the state holds such lands in trust for the public uses of navigation and the fisheries; that prospecting for oil or gas thereon would interfere with navigation and the fisheries —destructive of both—and would deprive the people of the full, free and unobstructed use of such lands and the water over the same and would impede and prevent the people of the state from the use, for any purpose, of the beach and tide land area of that portion of the Pacific Ocean included within the boundaries of said described lands; that the waters covering said lands are navigable and the granting of the petition would enable the permittee to destroy the navigability thereof and prevent the use thereof for navigation and prevent access to navigable waters of this state in violation of article XV of the constitution. It is also alleged that the prospecting for oil and gas or the production of oil and gas or either within the limits of the areas described would prevent and destroy fishing in the waters of said area and also in waters beyond said area and pollute them to such an extent as to render the fish therein unfit for human consumption; that the work of prospecting for, or developing or extracting minerals on said described lands would cause loss and damage, in the judgment of said surveyor-general, to property near said described lands. Finally, it is alleged, by way of answer, that respondent is without authority to grant the permit asked for in the petition for the reason that said lands, being tide and submerged lands, constitute a part of the ocean's bed, and are held in trust for the uses of navigation and the fisheries and there is no authority in the state of California to destroy or prevent the free and unobstructed use of such lands and the waters over them by the people and the act in question is void in that it is violative of the state constitution and contrary to the policy of this state and its people.

By way of answer, R. W. and Thelma I. Harthorn et al. allege themselves to be the owners of littoral rights in all the tide-lands described in the Boone petition and that said petitioner is not such littoral land owner. It is alleged that petitioner Boone lost his rights in the premises, inasmuch as he did not comply with article VII, section 2, and its subsections, Rules and Regulations, adopted by the surveyor-general, requiring personal service of the application for a permit. We have heretofore held such rules and regulations to be invalid and no further discussion of that subject is necessary. Said answering petitioners do not deny by unequivocal and positive terms that Boone filed his application on March 25, 1927, as alleged by him, but allege merely that on or about July 27 or August 27, 1927, Boone filed said application for said prospecting permit. If his application was filed as late as either of the days last above mentioned, R. W. and Thelma I. Harthorn would be within the six months' period, and they would have a preference over nonlittoral claimants as prescribed by section 4, chapter 303, Statutes and Amendments of 1921. The failure· to deny in positive terms that Boone filed his application as early as March 25, 1927, leaves the matter in a state of uncertainty but for the allegation in the Harthorn et al. petition, which, contrary to their answer, alleges, on information and belief, that the Boone petition was filed on or about March 25, 1927. Under the rule of construing pleadings, the petitioners have pleaded themselves out of court. Besides, they had the means of acquainting themselves with a record fact, and, having failed to do so, the positive allegation of petitioner Boone as to the fact is conclusive upon that issue. For the foregoing reasons the answering petitioners have no standing as against the Boone claim. It is lastly alleged in general terms, by way of answer, that the granting of the Boone petition would enable him to obstruct, and he would obstruct, said littoral land owners' access to the navigable water on which their lands front and he would damage other property rights of said littoral land owners and that the permit which Boone seeks, if granted, would be used to serve as a shield to exploit tide-lands for oil and gas for private gains and that the granting of said permit would be an invasion upon, and would impair, the natural rights of said adjoining littoral

owners. The force of these allegations will be noticed hereafter.

The Harthorn petition alleges that they took their first step to obtain said permit on October 10, 1927, and filed their application for the same on October 14, 1927. As littoral owners they would not be within the six months' period in making application following the earlier application made by Boone. The minerals contained in the soil covered by tidal and submerged lands belong to the state in its sovereign right. Littoral owners who have not complied with the provisions of the acts before us have no such right by reason of littoral ownership as would defeat the right of any other citizen who has complied with the requirements of said act. The proprietary rights of the owner of land bordering on tide water do not extend beyond the ordinary high-water mark. (Sec. 830, Civ. Code; *Koyer* v. *Miner,* 172 Cal. 448 [156 Pac. 1023]; *Henry Dalton & Sons Co.* v. *Oakland,* 168 Cal. 463 [143 Pac. 721]; *State ex rel. Peruvian Phosphate Co.* v. *Board of Phosphate Commissioners,* 31 Fla. 558 [12 South. 913]; *State* v. *Black Bros.,* 116 Tex. 615 [53 A. L. R. 1181, 297 S. W. 213].) In *San Francisco Sav. Union* v. *R. G. R. Petroleum Co.,* 144 Cal. 134 [103 Am. St. Rep. 72, 1 Ann. Cas. 182, 66 L. R. A. 242, 77 Pac. 823], it was held that the absolute sovereignty of the state over the soils under tide water in the several states does not deprive the littoral owner of his right of access from his own land to the ocean as against a *stranger.* But this right is not given to the owner of land bordering upon the ocean shore as against the state or its grantee in the exercise of a lawful use or purpose. (*People* v. *Southern Pac. R. R. Co.,* 166 Cal. 627 [138 Pac. 103]; *Shively* v. *Bowlby,* 152 U. S. 1 [38 L. Ed. 331, 14 Sup. Ct. Rep. 548, see, also, Rose's U. S. Notes].) It does not appear from the case presented that the right of access of littoral owners to the ocean will be cut off, but if it should be substantially impeded they would not be remediless if, in fact, they have any legal right as against the state or its agents in the premises. The littoral owners propose to do the things which they deny the right to others to do on lands that are held in trust for all the people. Their rights are prescribed by the state, which alone has the power to grant a preference, where substantial reasons

exist justifying a distinction. That such a distinction may be made in favor of littoral owners is reasonable and just and has been recognized by several sister states in the adoption of acts similar to the act before us in the instant case. (*State ex rel. Peruvian Phosphate Co.* v. *Board of Commrs.*, 31 Fla. 558 [12 South. 913].)

Petitioners Harthorn et al. allege offers and tenders in compliance with the requirements of the act, but that the surveyor-general refused to recognize their offers and tenders. The reason alleged for so doing is the same reason given for refusing the Boone permit. Both the attorney-general, on behalf of the surveyor-general, and Boone demurred to the petition of Harthorn et al. on general grounds, and both also answered. The demurrer and answer of the surveyor-general are substantially the same as recited in the Boone petition. The demurrer interposed by Boone is good, as the petition does not state facts sufficient to authorize the granting of the writ. As to the answer, it would justify an order granting judgment upon the face of the pleadings.

Charles M. Workman demurred on general grounds and filed an answer to the Boone petition. By said answer he alleges that he and Katherine Irene Workman, Jerome W. Workman and John Elines Workman, adult children of said Charles M. Workman, are littoral owners of a portion of the tide and submerged lands described in the Boone petition and as such owners, and within six months after the Boone application, and prior to November 1, 1927, he, the said Charles M. Workman, with the consent of his said children, who were owners with him, as tenants in common, filed his application for a prospector's permit. The same objection which was made by other petitioners to the Boone petition, based on the ground that he did not comply with article VII, section 2, of the Rules and Regulations prescribed by the surveyor-general requiring personal service of the application for said permit to be made upon the littoral land owner, is again repeated, but this objection is ineffectual for the reasons already pointed out. A full compliance with all the provisions of said act and the amendment and with all rules and regulations prescribed by the surveyor-general with respect to the granting of a prospecting permit is alleged. The right of the state to

grant a permit to a nonlittoral owner is alleged to be an invasion of the paramount inherent and constitutional right of the littoral land owners and violative of the due process clauses of the state and federal constitutions.

Charles M. Workman also filed a petition for a permit to prospect a portion of the lands included in the Boone petition. By said petition he avers that he took his first preliminary step on August 8, 1927, and that on August 15, 1927, he filed with the surveyor-general his application for a prospecting permit. He paid the filing fee and tendered the fee of fifty cents per acre for each acre included in his application and tendered a good and sufficient bond in the amount prescribed by the surveyor-general as a guarantee of good faith, but said fee and bond were rejected and said application for a permit was denied on the ground that prospecting the submerged ground described in his petition would, in the judgment of the surveyor-general, cause loss or damage to property near the land described in his application. Boone demurred to the Workman petition on general and special grounds and filed an answer.

Workman, in a supplemental pleading filed by him, fixed the time when he applied for a permit as of October 19, 1927, more than six months after the Boone application and, this being so, he would have no right whatsoever as against Boone, inasmuch as his application came too late.

On March 17, 1926, H. E. Shudde, a nonlittoral land owner, caused to be erected in a conspicuous place upon the tidal and submerged lands described in his petition a monument conforming to the statutory height and size and posted thereon the notice required by law and performed and offered to perform and stood ready to perform all the other acts required to be performed in the order and in the manner and at the time fixed by the act governing the procedure herein. That on April 12, 1926, he filed an application for a permit to prospect the submerged lands described in his application, paid the filing fee and tendered to said surveyor-general the bond as fixed and required by him and also the fee of fifty cents per acre for each acre of land included in his application, but said surveyor-general refused both tenders; that subsequently to the filing of petitioner's application, he filed, on September 24, 1926, upon the request of the surveyor-general, an amended

description, which is a true description of the lands described in the petition herein; that on September 13, 1927, petitioner again tendered said fee and bond to said surveyor-general and that the fee was refused, but the bond was accepted and placed on file by said surveyor-general; that no person claiming to be a littoral owner of said lands has within a period of six months after the filing of said amended description taken any steps or made application to obtain a prospecting permit covering any of the lands in said petition described. The surveyor-general's refusal to grant petitioner said permit is based upon the ground that petitioner not having complied with article VII, section 2, Rules and Regulations, requiring personal notice to be served upon littoral land owners, is not entitled to said permit and upon the further ground that the surveyor-general is authorized to refuse permits to applicants when in his judgment the developing or extracting of minerals by the applicant would cause loss and damage to adjacent property. These reasons we have held to be insufficient to justify a refusal of a prospecting permit. Actual notice on the part of Shudde is alleged to have been given to said littoral land owners by the fact that the petitioner published for four successive weeks in a newspaper of general circulation published in the county of Ventura a notice of the filing of his application and, further, because of petitioner's repeated posting of notices, at the suggestion of the surveyor-general, upon the land described in his petition and for the further reason that petitioner's application was brought to the personal notice of said littoral owners.

The answer to the petition and return to the writ of mandate filed by the surveyor-general are the same in the main features as those filed by said officer in the other proceedings. Harry A. Chamberlin, who had filed an application for a prospecting permit covering a portion of the said lands described in the Shudde petition, was granted permission to intervene in the Shudde proceeding. He is a nonlittoral land owner and took his first step under the provisions of chapter 303, Statutes of 1921, on August 18, 1927, by erecting a monument upon the lands described by him. On September 14, 1927, he filed his application for a prospecting permit and on the same day tendered the

filing fee computed at the rate of fifty cents upon each acre included in his application and the $5 filing fee, as prescribed by law, but the surveyor-general refused to accept the application of said Harry A. Chamberlin and refused to issue him a prospecting permit. As a separate and distinct defense to the petition of Shudde and by way of further answer to Shudde's petition for a writ of *mandamus*, Harry A. Chamberlin, as intervener, alleges that Shudde did not within a reasonable time after the expiration of six months next succeeding his application dated April 13, 1926, apply to this court or any other court to enforce such rights as he may have been entitled to by virtue of his application and he was guilty of bad faith and laches in not pressing his rights sooner, inasmuch as he had notice in March, 1927, that said surveyor-general would not grant his application. The petition in intervention alleges that Shudde did not apply for the writ of *mandamus* herein until after intervener Chamberlin had applied to the superior court of the county of Sacramento to compel said surveyor-general to issue to him a permit to prospect said described lands; that the petitioner Shudde did not apply for a writ of *mandamus* until the character of the geological structure in which said property is situated became greatly increased in value.

The fact that a petition was filed in the superior court of the county of Sacramento on September 17, 1927, by intervener Chamberlin against the surveyor-general for an order commanding him to issue to intervener said prospecting permit, which action has not been formally disposed of, seems to be relied on by intervener as a bar to the Shudde petition herein. We are unable to see how the filing of that proceeding in the superior court of Sacramento County could affect the rights of petitioner Shudde. The Chamberlin petition herein contains no allegation that Shudde was made a party to that proceeding or was served with any process or had any knowledge of the Sacramento County proceeding. Besides, the Sacramento County forum was voluntarily abandoned by petitioner Chamberlin and this forum selected in its place to hear and determine precisely the same questions that were involved in the Sacramento County proceeding.

In the original petition filed by petitioner Chamberlin for said writ he avers that at the time he posted notice of his application upon said described lands there was no other notice posted upon said lands of like or similar purport; nor was there any application pending with the respondent for a permit to prospect for oil or gas upon said described lands. The petitioner admits, however, that Shudde's application was made prior to his, but attempts to avoid its force by invoking the doctrine of laches. The allegation that there was no other application pending with the surveyor-general at the time Chamberlin filed his application, in the face of the averments and admissions appearing upon the face of the papers before us, amounts to but an erroneous conclusion drawn by the pleader. The Shudde application appears to conform to the provisions of the act and the only grounds urged against his asserted right by his adversary is that the doctrine of laches estops him. The delay in commencing proceedings against the surveyor-general, considering the uncertain state of mind in which that officer found himself as to his duties and powers under the act, was not so great as to justify a finding that Shudde was guilty of laches. Besides he made many efforts to convince the surveyor-general that he was entitled to a permit and manifested a willingness to conform to any reasonable requirement that might be prescribed. Said petitioner Chamberlin, who, like Shudde, is not a littoral proprietor of any land along the ocean shore line, erected his monument on the lands described in the petitions of both claimants on August 18, 1927, and filed his application for said permit on September 14, 1927, a little short of a year after the Shudde application. The surveyor-general from the beginning refused to recognize his application and rejected all of his tenders and offers made in an effort to bring himself within the provisions of said act.

Shudde and Hickey Brothers Company, a corporation, and the surveyor-general either demurred to or filed answers or both demurred and filed answers to the Chamberlin petition upon grounds similar to those considered in other applications, which will not be set out for the additional reason that the Shudde application was filed prior to the Chamberlin application and consequently claimant Shudde has priority over claimant Chamberlin.

The joint application of Hickey Brothers Company, a California corporation, et al., claims the right to have issued to them a permit to prospect a portion of the lands embraced in the Shudde application. Said petitioners allege that they are the littoral proprietors of all the tide and submerged lands described in their petition, which includes lands described in Shudde's petition, and are the owners of all the lands abutting or fronting on the lands described by them. It is further alleged, on information and belief, that Shudde filed an application for a prospector's permit on April 12, 1926, and that said petition was accepted by the surveyor-general on September 24, 1926, and that said Shudde was requested by the surveyor-general to make personal service upon all the littoral proprietors of tide and submerged lands in compliance with the rule and regulation which we have herein declared void as being in excess of the authority of the surveyor-general, but that Shudde refused and neglected to make such personal service. It is also alleged that the surveyor-general refused to consider or recognize their application, which in every respect complied with the provisions of law and the rules and regulations prescribed by the surveyor-general in such cases provided. The application of Hickey Brothers Company et al. was filed October 14, 1927, more than six months after the Shudde application, and as to the lands included in the latter's application, it came too late. Harry A. Chamberlin, whose petition herein has been considered, intervened in this proceeding (Hickey et al.), as he did in the Shudde proceeding, setting forth his claim upon substantially the same grounds as are set out in the pleadings in the other proceeding. Shudde and the surveyor-general demurred, and the latter filed an answer. It is unnecessary to notice specifically the substance of said demurrers and answers, other than to say that the objections raised therein, if not already disposed of by what has been said, will be amply covered in the course of this decison.

The seventh and last petition for a writ of *mandamus* filed herein is the petition of Kittie C. Ballard, J. C. Ballard, Jessie Ballard Daggs and Jean Ballard Saxby. Claiming to be the owners as tenants in common of lands littoral to tide and submerged lands situated in the Pacific Ocean, petitioners applied for a prospecting permit on

October 10, 1927, and their application was rejected by the surveyor-general for the reason, as expressed in his correspondence with the representatives of petitioners, that he entertained a doubt as to the constitutionality of the act authorizing the issuance of said permits, the validity of which act was then pending in the courts for decision. Four months prior to petitioners' application for a permit, permits had been granted to Neil C. Needham and R. N. Ferguson, respectively, upon applications made by them to prospect for oil and gas a portion of the lands included in the application of Kittie C. Ballard and her associates. Wilbur C. Finch applied for a permit on June 12, 1927, to prospect other lands included in the subsequent Ballard application, but his application is alleged to be pending for decision in the office of the surveyor-general. Neither Needham, Ferguson nor Finch are owners of lands littoral to the tide-lands described by them.

Kittie C. Ballard and her associates insist that the permits issued to Needham and Ferguson are invalid, for the reason that said littoral proprietors were not personally served with notice, nor in lieu thereof served by publications, as provided by the rules and regulations prescribed by the surveyor-general, and, this being so, they are entitled to the permit as prayed for. This question has been disposed of adversely to petitioners' contention. None of the parties whose interests as permittees will be affected by this proceeding have appeared except Finch, whose application was filed prior to the Kittie C. Ballard petition. Neither Needham nor Ferguson, or the assignees of either, has been joined in the action, nor does it appear that either was served with process or had any kind of notice of the commencement of this proceeding or the hearing thereof. Finch, by his demurrer, which is both general and special, raises the question of several actions being improperly united; for example, an action for the revocation of permits heretofore issued with an action to compel the issuance of a permit to petitioners herein; further, that petitioners, being but private citizens, are not the proper parties, nor have they the authority to maintain an action to revoke said permits, implying that such a suit may be maintained only upon the relation of the state. The point is also made that the permittees are necessary parties to the

action. The answer denies that said petitioners are or were at any time mentioned in said petition the owners as tenants in common or otherwise of any real property adjoining or littoral to any of the lands embraced in any of the applications referred to as the Needham, Ferguson and Finch applications. It is affirmatively alleged by the answer that a strip of land not owned by petitioners and in which they claim no interest lies between the uplands claimed by petitioners to be owned by them and the tidelands embraced in the permits issued to Needham and Ferguson, including also the tide-lands described in Finch's pending application. The allegation which uniformly appears in the various petitions, to the effect that on November 1, 1927, all of the tide and submerged lands in controversy became a part of the known geological structure of a producing oil and gas field by reason of the fact that a well drilled thereon began to produce oil on or prior to November 1, 1927, and that on November 16, 1927, the surveyor-general classified and declared said tide-lands herein described or referred to as lying within and being a part of said known geological structure, is repeated and seems to be conceded to be true. Finch alleged that petitioners did not at any time prior to November 16, 1927, actually tender to the surveyor-general the bond required by the rules and regulations prescribed by said officer, nor any portion of the prospecting fee. Finch alleges that assignments of the permits sought to be revoked were made by permittees Needham and Ferguson, with the approval of the surveyor-general, and points out the omission of said assignees as parties, and insists that they are necessary parties to this proceeding. He also, by way of answer, alleges the pendency of an action brought by him in the superior court of the county of Sacramento to compel the surveyor-general to grant him a permit upon the application heretofore mentioned, but he does not plead said action by way of abatement of the present action, nor does he make any request that the present action abate by reason of the pendency of said other proceeding.

The specific claim stressed in the Ballard petition (S. F. No. 12766) is that the adversary claimants did not observe the rule prescribed by the surveyor-general as to the service of notice upon littoral proprietors. If that was

the only justiciable question in the case, it would be decided against petitioners on what has already been said. But the Ballard petitioners claim to be littoral proprietors and allege that their application was made within six months subsequent to the filing of the Needham, Ferguson and Finch applications. If that is true, they may have rights by virtue of section 4 of said act. That they are littoral proprietors, however, is disputed, and that they complied with the provisions of the law in other respects is denied.

It is obvious that the pleadings in this proceeding should have been settled and the disputed questions of fact found and determined by the superior court of this state, a tribunal constituted and provided with the appropriate machinery for hearing and determining both questions of fact and law reasonably expeditiously. We are asked to command the surveyor-general to cancel permits issued to one group of applicants and grant them to another group, an order which can only be made after a judicial determination of disputed issues of fact. In addition to this and the settling of pleadings, we are asked to enter judgment against parties interested in the subject matter who have had no opportunity to be heard. For obvious reasons the Kittie C. Ballard et al. petition for a writ of *mandamus* (S. F. No. 12766) must be and is hereby dismissed and petitioners are permitted, if, after what has been said, they are so advised, to an appropriate forum to litigate such questions as are not concluded by this decision. That neither time nor labor have been conserved by permitting any of the petitioners herein to come into this court in the first instance is forcefully illustrated by the elaborate and laborious statement which the many issues and cross-contentions raised by adversary claimants and numerous *amici curiae* have made necessary.

Boone and Shudde have alleged a strict compliance with the provisions of the act by setting forth, step by step, the course pursued by them and have kept their tenders good. The other adversary claimants alleged in general terms a compliance with the provisions of said act or a refusal on the part of the surveyor-general to treat with them.

Those petitioners claiming to be owners of littoral rights herein, in making their several applications to the surveyor-general for permits, did not base their claims upon the

preference given to littoral owners by said act, but followed the procedure prescribed for nonlittoral claimants in making their applications, and it was in this court that they set up for the first time claim to a preference by virtue of being littoral owners. Some of the respective owners of lots littoral to said tide-lands pooled their interests. Objection is made to this method of attempting to acquire such rights as being without statutory warrant. In view of our conclusions on other controlling points which conclude them as permittees, it becomes unnecessary to consider the rights of several owners to pool their interests.

We now turn from the consideration of the adverse claimants, *inter se,* to a consideration of the objections made to the act on constitutional grounds by the attorney-general on behalf of the surveyor-general and the state of California, which are supplemented by exhaustive briefs presented by *amici curiae* supporting the action of the surveyor-general in his refusal to grant the permits sought to be obtained by these proceedings. Several hundred pages of briefs are devoted to discussions of the title in the soil of the sea or arms of the sea, which at common law was vested in the sovereign in trust for the people. The common law, or law of England, upon this subject was brought to this country by our early ancestors and continues to be the law of the land except so far as it may be affected by express grant, by prescription or usage. In the leading case of *Shively* v. *Bowlby,* 152 U. S. 1 [38 L. Ed. 331, 14 Sup. Ct. Rep. 548, see, also, Rose's U. S. Notes], Mr. Justice Gray made an exhaustive examination of the entire subject, and, after reviewing the laws of many states, he thus summarized the result of his examination:

"The foregoing summary of the laws of the original states shows that there is no universal and uniform law upon the subject; but that each state has dealt with the lands under the tide waters within its borders according to its own views of justice and policy, reserving its own control over such lands, or granting rights therein to individuals or corporations, whether owners of the adjoining upland or not, as it considered for the best interests of the public. Great caution, therefore, is necessary in applying precedents in one state to cases arising in another."

We do not deem it necessary to pursue the question of the title to tide-lands to the extent that the subject has been discussed by counsel, for the reason that the act does not purport to divest the state of its title to any part of is tide-lands, but merely grants to its permittees a license or privilege of extracting minerals from the soil, the ownership of which is held in its proprietary right, for a term of years, upon an acreage and royalty basis. ▮ It is clear that one of the purposes of the legislature by the enactment of said chapter 303, Statutes and Amendments of 1921, page 404, was to give to the citizens an opportunity to intercept the large volumes of oil gravitating seaward to inextricable depths, and to reduce to useful purposes oil, gas and mineral deposits reposing beneath the ocean's bed. The commercial value of these subterranean products is enormous. The contribution made to commerce and the varied industries of the world and to the comfort of the race by the modern intensive development of the oil and gas industry is not surpassed, if it is equaled, by any other of the natural agencies or physical forces which are contributing to the material welfare of mankind, including electrical energy. Gasoline is the power that largely moves the commerce of nations over lands and sea; it furnishes much of the power necessary to the manufacturer, agriculturist and miner, as well as power needful in the reclamation of swamp and overflowed land and in the irrigation of arid and waste land. It is the only power that is practical for aeroplane navigation. Gasoline is so closely allied with state and national welfare as to make its production a matter of state and national concern. If it can be said of any industry that its output is "in aid and furtherance of commerce and navigation," and its production "a public benefit," the production of gasoline, by reason of the motive elements that inhere in it and its universal use and adaptability to varied uses and the convenient and portable form in which it may be confined, would entitle it to a high classification in the scale of useful, natural products. It is a mover of commerce and fills the office of "a public benefit." The government has recognized it as a necessary naval supply and has fostered and encouraged exploration for mineral deposits and the development of oil-fields wheresoever found to exist. The state legislature, by adopting

the act before us, recognized the use of gasoline and oil to be practically indispensable to the needs of rapid, expanding industry and commerce. The federal government from its earliest organization has consistently adopted acts containing the most liberal terms as inducements to engage its citizens in the exploration and development of its mineral resources. In fact, the development of the mineral resources, of which oil and gas are among the most important, is the settled policy of state and nation, and the courts should not hamper this manifest policy except upon the existence of most practical and substantial grounds. Our state act was fashioned after an act adopted by Congress in 1920, known as the Federal Leasing Act, and the two acts are very similar in every important feature.

None of the lands involved in these proceedings front upon any incorporated city, nor are they situated upon a harbor, bay, inlet or estuary. Neither are they within the inhibitions of the distance limitations or the sale and grant clauses of article XV, section 3, state constitution, which provides:

"All tide lands within two miles of any incorporated city or town in this state, and fronting on the waters of any harbor, estuary, bay or inlet, used for the purposes of navigation, shall be withheld from grant or sale to private persons, partnerships, or corporations."

The license or privilege authorizing the permittee to prospect and mine tide-lands is denominated by the act a lease, but in practical effect it strongly partakes of the character of a contract to prospect or mine said tide-lands on a share or percentage basis. In no sense does the state part with title to its tide-lands. More than this, it expressly "reserves from sale except upon a rental and royalty basis" all coal, oil, oil shale, phosphate, sodium and other mineral deposits in lands belonging to the state, and persons authorized by said act to prospect for, mine and remove such deposits are restricted to as small a portion of the surface area as may be reasonably required for mining and removing such deposits. In this respect the instant case is widely different from *Illinois Cent. R. R. Co.* v. *People of the State of Illinois,* 146 U. S. 387 [36 L. Ed. 1018, 13 Sup. Ct. Rep. 118, see, also, Rose's U. S. Notes], the case frequently cited by respondent, surveyor-general, and the *amici curiae* in sympathy with his position. In the case last cited the state

undertook to grant into exclusive private ownership 1,000 acres of the submerged beds of Lake Michigan, constituting a large acreage of the city of Chicago's waterfront, freed of any public easement. This was clearly a deprivation of the enjoyment of every right for which said lands were held in trust by the state, as pointed out in the following excerpt from said decision:

"The control of the state for the purposes of the trust [that is, the trust for the people of the state that they may enjoy the navigation of the waters, carry on commerce over them and have the liberty of fishing therein free from interference of private parties] can never be lost, except as to such parcels as are used in promoting the interests of the public therein, *or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining*. . . . It is grants of parcels of land under navigable waters that may afford foundation for wharves, piers, docks and other structures in aid of commerce, and grants of parcels which, being occupied, do not substantially impair the public interest in the lands and water remaining, that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power consistently with the trust to the public upon which such lands are held by the state." (Italics supplied. 146 U. S. 387, at pp. 452 and 453.)

With full knowledge of the subject the legislature found that there was nothing in the drilling and operation of oil-wells conducted in the manner provided by the statute that would substantially impair the paramount public interest in the lands and water remaining, and upon a consideration of the case we find nothing that would justify us in holding that the finding of the legislature, which is conclusive in such matters (*People* v. *California Fish Co.,* 166 Cal. 576 [138 Pac. 79]), is not fully supported by the facts.

To justify an interference by courts with the right of the legislature to alienate tide or submerged lands it must appear that such grants do or will impair the power of succeeding legislatures to regulate, protect, improve or develop the public rights of navigation and fishing. (*Oakland* v. *Oakland Water Front Co.,* 118 Cal. 160 [50 Pac. 277].) It cannot be seen that the legislation in the instant case will embarrass immediate or remote legislation.

By the provisions of the act the state reserves a supervisory control over the entire subject matter and ample provision is made for a cancellation of the lease or privilege upon a violation of any of its numerous terms designed for the protection of the state. But aside from the precautionary steps taken by the state to safeguard the public's interests, the law vouchsafes ample protection to the paramount rights of the public in the absence of express statutory provisions on the subject.

"The words of the Constitution are to be considered as incorporated in the grant or patent [granting tide lands] the same as if inserted therein. They become a part of it and qualify it so that the estate granted is limited to the permitted uses." (*Forestier* v. *Johnson*, 164 Cal. 24 [127 Pac. 156].) So in the instant case, should said permittees offer any substantial interference incompatible with navigation, fishing or commerce, the state and federal government would have the unquestionable right to abate it. The license or privilege or leasehold by which the permittees are granted the right to explore and mine for gas and oil does not constitute a grant or sale of tide-lands in the sense that those terms are used in the prohibitory provisions of article XV, section 3, state constitution. In *San Pedro etc. R. R. Co.* v. *Hamilton,* 161 Cal. 610 [37 L. R. A. (N. S.) 686, 119 Pac. 1073], it was held that a lease made to a corporation by the city of San Pedro of tide-lands was valid and did not come within the inhibitory provisions of the constitution forbidding the granting or sale to private persons, partnerships or corporations of tide-lands within two miles of any incorporated city or town and fronting on any harbor, estuary, bay or inlet used for the purpose of navigation. The relations of the state with its permittees or lessees in the instant case do not create a superior estate in said tide-lands than was created by the lease entered into by the city of San Pedro and said corporation.

The surveyor-general is constituted the agent of the state by the act under consideration, as he is made its agent in numerous acts providing for the sale of salt marsh, tide and other public lands, to carry out and accomplish the purposes of the act and to that end he may make all rules and regulations not in conflict or inconsistent with the provisions of said act. His powers in the way of regulation and adminis-

tration are many, and the legislation conferring them is to be given full force and effect when enacted according to the constitutional mandate and when not in conflict with the express provisions of said act. By chapter 227, Statutes and Amendments of 1923, page 452, the attorney-general, the chairman of the state board of control and surveyor-general are constituted a commission to lease to the highest responsible bidder any land belonging to the state of California and dedicated to a public use where such lands contain, in the judgment of said commission, oil, gas and other hydro-carbons in commercial quantities. The act is but another illustration of the policy of the state with respect to the extraction of its minerals from state lands and was unquestionably passed to remove the obstacle pointed out in *McNeil* v. *Kingsbury,* 190 Cal. 406 [213 Pac. 50]. In that case McNeil applied for a writ of mandate in this court to compel the surveyor-general to issue to him a prospecting permit, under the provisions of the identical act attacked by respondent surveyor-general, to prospect for oil upon the grounds of the Norwalk State Hospital for the Insane at Norwalk, California. The petition was denied on the grounds that it was not intended by the legislature that said act should apply to lands already devoted to a public use.

· A copy of a photograph taken January 23, 1928, twenty-four hours after high tide, showing the section of the ocean shore line upon which the tide-lands in controversy abut, is appended to the briefs of Boone and Shudde. That the photograph is a true representation of the situation is admitted. It shows a precipitous, mountainous upland facing in crescent shape the open sea. A number of oil derricks are erected upon the highlands and several derricks and other structures appear to be erected upon the beach near the point where the surf extends its flow under normal conditions. The beach which skirts the shore is very narrow. The narrow shelf of the beach at the foot of the cliffs is occupied by the tracks of the Southern Pacific Railroad. Paralleling the railroad is the state highway, which for a considerable distance is built over tide-lands upon a causeway. There is no wharf or landing structure of any kind erected in the vicinity. The court is invited to and will take judicial notice of the coast lines within the state and will also resort to publications issued by the department

of commerce describing and delineating the United States coast and geodetic surveys. The coast in question is not a harbor, or haven, nor does it afford natural facilities for the landing of vessels. It is asserted, and not contradicted, that the record of the rise and fall of the tide at this point shows that the tide ebbs upon occasions a distance of seven hundred or eight hundred feet from the mean high-tide line and the sea is too heavy for small vessels to weather and too shallow to float large ones. It may be said of the situation that the coast line at the point in question is an unnavigable portion of a vast body of navigable water, and the use to which the state proposes to devote the soil, from a practical point of view, would not be incompatible with, or in "derogation of the government's trust to preserve needed navigable waters for the benefit of the people." (*Bolsa Land Co.* v. *Burdick,* 151 Cal. 254 [12 L. R. A. (N. S.) 275, 90 Pac. 532].) No claim is made that the shallows, shoals or depth of the area in question are valuable for fishing purposes.

No uncertainty can exist as to the rights of the state to absolutely alienate its tide and submerged lands when they are unfit for navigation, are useless as aids of commerce and possess no substantial value as fishing grounds. The policy of this state is and has always been to encourage its citizens to devote waste and unused lands to some useful purpose. The power of the state to absolutely alienate lands perpetually covered by water has been upheld by all courts of the nation, state and federal, where the land so covered was severed from the main body by harbor and other improvements in such manner as to leave the remaining waters of no substantial use to navigation or commerce. It is only in those cases where the reduction of the water area amounts to a substantial interference with navigation and commerce or the fisheries that the absolute power of alienation by the sovereign and its control and dominion over said lands can be questioned.

In *Eldridge* v. *Cowell,* 4 Cal. 80, this court had before it the rights of an owner of a water lot, which he held, as did many other owners of lots similarly situated, under an alcalde grant and by the act of the legislature of this state passed in March, 1857. Said lots were a part of a water district, which had been cut off from the main waters of the San Francisco Bay by the construction of harbor improvements

and sold into private ownership. The area known as the water district composed a large portion of the business district now lying north of Market Street and east of Montgomery Street. The plaintiff Eldridge was the owner of one of said water lots. He brought an action to enjoin the defendant from obstructing the navigation to his lot by mooring and anchoring store ships and making embankments in front of his lot. The defendant was the owner of the lot upon which the store ship was anchored. In denying plaintiff relief, this court said: "She [the state] holds the complete sovereignty over her navigable bays and rivers, and although her ownership is, by the law of nations, and the common and civil law, attributed to her for the purpose of preserving the public easement, or right of navigation, there is nothing to prevent the exercise of her power in certain cases to destroy the easement, in order to subserve the general good, which, when done, subjects the land to private proprietorship."

The rule to be kept in mind and which is recognized by every case bearing on the subject, including *Illinois Cent. R. R.* v. *Illinois, supra,* the case chiefly relied upon by the surveyor-general, and from which we freely quote, is that the state has the unquestionable right to alienate its tide and submerged lands subject to the "trust in which they are held for the people of the state that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein free from the obstruction or interference of private parties."

In the case last cited the question was, as stated by the author of the opinion, Mr. Justice Field, "whether the legislature was competent to deprive the state of its ownership of the submerged lands in the harbor of Chicago [comprising a considerable portion of Lake Michigan] and of the consequent control of its waters; or, in other words, whether the railroad corporation can hold the lands and control the waters by grant, against any *future* exercise of power over them by the state." The extent of the submerged lands conveyed in fee to a private corporation, comprising 1,000 acres, is especially emphasized, the court observing that the harbor is of immense value to the people of the state of Illinois in the facilities it affords to its vast and increasing commerce. The area of the submerged area proposed to be ceded to the

private corporation embraced more than three times the area of the outer harbor and not only included all of that harbor but embraced adjoining submerged lands which, in all probability, would be included in the harbor. The arrivals and clearings of vessels at the port of Chicago is commented upon, and the shipping and tonnage of vessels is shown to be enormous. As stated in the opinion, the ownership of the navigable waters of the harbor and of the lands under them was a subject of public concern to the whole people of the state. The opinion holds that such a vast area, including practically the whole of an important state harbor, could not be alienated by the state and placed in the hands of a private corporation created for a purpose not compatible with the trust for which it was held. But the opinion does recognize the alienability of such lands "in those instances mentioned of *parcels* used in the improvement of the interest thus held, or when *parcels* can be disposed of without *detriment* to the public interest in the lands and waters remaining." (Italics supplied.) It was the passing of practically the entire acreage of the lands of the harbor covered by tide-waters, quite a portion of which is perpetually submerged, into private ownership to be devoted to a use that would be wholly inconsistent with and an impairment of the interest of the public in said lands and the use of the remaining waters for any uses which the law forbade. "Grants of *parcels* of land," the opinion observes, "under navigable waters, that may afford foundation for wharves, piers, docks and other structures in aid of commerce, and grants of parcels, which being occupied, do *not* substantially impair the public interest in the lands and waters remaining" are "sustained in the adjudged cases as a valid exercise of legislative power consistently with the trust to the public upon which such lands are held." The opinion states that no instance exists where, as by the case presented, the harbor of a great city and its commerce have been allowed to pass into the control of any private corporation.

The rights of the several states as to the ownership of and control over tide and submerged lands within their borders is thus stated in the Illinois Central Railroad case:

" . . . the ownership of and dominion and sovereignty over lands covered by tide waters, within the limits of the several states, belong to the respective states within which they are

found, with the consequent right to use or dispose of any portion thereof, when that can be done without substantial impairment of the interest of the public in the waters, and subject always to the paramount right of Congress to control their navigation so far as may be necessary for the regulation of commerce with foreign nations and among the states.''

The state cannot abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the case of parcels used in promoting the interest of the public therein, or when parcels can be disposed of without impairment of the public interest in what remains.

Nothing is said in *Illinois Central R. R.* v. *Illinois, supra,* that would indicate that the uses to be made of the tide-lands in the instant case by the agents or permittees of the state in extracting oil minerals from the ocean beds under its control and regulation would substantially impair the public interest in or use of the vast remaining area of the ocean.

The trust in which tide and submerged lands are held does not prevent the state from reclaiming tide and submerged lands from the sea where it can be done without prejudice to the public right of navigation and applying them to other purposes and uses. As said in *Ward* v. *Mulford,* 32 Cal. 365:

''There are large tracts of salt marsh lands, of which the land in suit is an example, which are covered and uncovered by the flow and ebb of the neap tides, and therefore belong to the state by virtue of her sovereignty, which are of no possible use for the purposes of navigation, but may be valuable for agricultural or other purposes if reclaimed from the tides. Such lands the state may undoubtedly grant in private ownership for the purposes of reclamation and use, for by such a course no right of the public to their use for the purposes of navigation would be prejudiced. On the contrary, the right of navigation, in many cases, might be subserved by such reclamation.''

*Shively* v. *Bowlby,* 152 U. S. 1 [38 L. Ed. 33, 14 Sup. Ct. Rep. 548], a more recent case than the Illinois Central Railroad case, in making a most profound review of all the leading cases of the federal courts on the subject, quotes ap-

provingly from *Hardin* v. *Jordan*, 140 U. S. 371 [35 L. Ed. 428, 11 Sup. Ct. Rep. 838, see, also, Rose's U. S. Notes], as follows:

"With regard to grants of the government for lands bordering on tide water, it has been distinctly settled that they only extend to high water mark, and that the title to the shore lands under water in front of lands so granted enures to the state within which they are situated, if a state has been organized and established there. Such title to the shore and lands under water is regarded as incidental to the sovereignty of the state—a portion of the royalties belonging thereto, and held in trust for the public purposes of navigation and fishery—and cannot be retained or granted out to individuals by the United States. Such title being in the state, the lands are subject to state regulation and control, under the conditions, however, of not interfering with the regulations which may be made by congress with regard to public navigation and commerce. The state may even dispose of the usufruct of such lands, as is frequently done by leasing oyster beds in them, and granting fisheries in particular localities; also, by the reclamation of submerged flats, and the erection of wharves and piers and other adventitious aids of commerce. Sometimes large areas so reclaimed are occupied by cities, and are put to other public or private uses, state control and ownership therein being supreme, subject only to the paramount authority of congress in making regulations of commerce, and in subjecting the lands to the necessities and uses of commerce. This right of the states to regulate and control the shores of tide waters and the land under them is the same as that which is exercised by the Crown of England. In this country, the same rule has been extended to our great navigable lakes, which are treated as inland seas; and, also, in some of the states, to navigable rivers, as the Mississippi, the Missouri, the Ohio, and, in Pennsylvania, to all the permanent rivers of the state; but it depends on the law of each state to what waters and to what extent this prerogative of the state over the lands under water shall be exercised."

The court, after closing the quotation, continued:

"In the yet more recent case of *Illinois Central Railroad* v. *Illinois*, which also arose in Illinois, it was recognized as the settled law of this country that the ownership of and

dominion and sovereignty over lands covered by tide waters, or navigable lakes, within the limits of the several states, belong to the respective states within which they are found, with the consequent right to use or dispose of any portion thereof, when that can be done without substantial impairment of the interest of the public in such waters, and subject to the paramount right of congress to control their navigation so far as may be necessary for the regulation of commerce. (146 U. S. 387, 435–437, 465, 474 [36 L. Ed. 1018, 13 Sup. Ct. Rep. 110, 111, 112, 126].)

"Notwithstanding the dicta contained in some of the opinions of this court, already quoted, to the effect that congress has no power to grant any land below high water mark or navigable waters in a territory of the United States, it is evident that this is not strictly true."

The principle announced by the federal courts is reaffirmed in *Oakland* v. *Oakland Water Front Co.*, 118 Cal. 160 [50 Pac. 277]. It was held in that case that as a general proposition the state has full power to alienate lands into private ownership which are covered by the daily flux and reflux of the tides subject only to the paramount public rights where capable of reclamation without detriment to the public right, but that the town of Oakland had no power to alienate its entire waterfront into private ownership unless such power was conferred by the legislature, and that the act of the legislature ratifying and confirming the ordinances of the town of Oakland applied exclusively to the local laws of the town and not to ordinances which were mere grants or attempted grants of the lands of the corporation, which were in effect attempted conveyances of the property interest of the town in its waterfront lands. In other words, the intent to alienate did not appear. The right of the state to alienate its tide and submerged lands by statute where the intent of the statute is clearly expressed or necessarily implied was again reaffirmed by this court in *People* v. *California Fish Co.*, 166 Cal. 576, wherein it is said, at page 597 [138 Pac. 79, 88]:

"When the state, in the exercise of its discretion as trustee, has decided that portions of the tide land should be thus excluded from navigation and sold to private use, its determination is conclusive upon the courts; but statutes purporting to authorize an abandonment of such public use

will be carefully scanned to ascertain whether or not such was the legislative intention, and that intent must be clearly expressed or necessarily implied. It will not be implied if any other inference is reasonably possible. And if any interpretation of the statute is reasonably possible which would not involve a destruction of the public use or an intention to terminate it in violation of the trust, the courts will give the statute such interpretation."

Upon an examination of the numerous decisions of the American courts holding that lands covered by navigable waters are held in aid of and for the promotion of commerce, navigation and fishing, it will be found that superadded to the uses of commerce, navigation and fishing, when the uses in the case at hand to which the lands are to be devoted are not strictly within the narrow definition of any or all of said terms, said decisions employ such phrases as uses for the "public welfare," "parcels of land as are used in promoting the interests of the public," suggesting that when great public interest may be subserved by the alienation of parcels of tide and submerged lands the state's determination of the question in favor of alienation will not be disturbed by the courts.

In the instant case the state does not part with title to its lands, but withholds them from sale and also reserves an interest in said minerals mined on shares. No part of the lands from which said minerals are extracted is alienated into private ownership, nor is any legal right of the littoral owner invaded. No harm can come to fisheries under the protective provisions of the act, as it must be presumed that the provisions of the act will be observed, and if not observed, the general laws enacted for the protection of fish and sea life against the pollution of waters by penalizing persons or corporations who cause or are responsible for deleterious substances escaping into the public waters of the state, are amply sufficient to protect sea life against serious injury or destruction.

Nor is there any substantial cause of alarm lest the twelve hundred miles of our sea coast will be barricaded by "a forest of oil derricks," which will interfere with commerce or navigation. The state may at any time remove structures from the ocean erected by its citizens, even though they have been erected with its license or consent,

if it subsequently determines them to be purprestures or finds that they substantially interfere with navigation or commerce. (*People* v. *California Fish Co.*, 166 Cal. 576 [138 Pac. 79]; *Illinois Cent. R. R.* v. *Illinois, supra.*) But aside from this it is a matter of common knowledge that gas and oil strata exist in but a few sections of the state and the geological indications are easily recognized by geologists and those familiar with the subject. It is not probable that those who are financially able to bear the heavy expense of drilling oil-wells and meeting the other heavy expense attendant upon prospecting for oil and gas will be so insane as to engage in expensive experiments except in those localities where oil and gas will probably be found in commercial quantities. It is also a matter of common knowledge to which our attention has been called by all the parties to these proceedings that the state has already granted permits to private persons or corporations to prospect for oil and gas in the waters of the Pacific Ocean near the locality where the lands in question are situated and that oil-wells are now and for some years past have been in full operation. No serious, if any, complaint of improper operation to the detriment of commerce, navigation or the fisheries has been made to the state or federal government. It is presumed that the operation of all wells for which permits are herein sought will be operated in as efficient and scientific manner as those now in operation. The legislature before adopting the act before us fully considered all questions of fact and policy germane to the subject, and found that oil-wells could be operated in the soil of the ocean without substantially impairing any of the rights for which said lands are held in trust for the benefit of the state.

In concluding, it may be helpful to observe that Florida, Texas, Louisiana, Oklahoma and other states have adopted statutes strikingly similar to our statute, in recognition of the public benefit that will accrue to the commonwealth by the developing of the phosphates, gas, oil and other mineral wealth which lie beneath submerged lands, and in no instance have such statutes conferring the same powers upon private parties and corporations as our act confers been condemned upon the constitutional grounds which are here urged against our state statute. A few of the cases which are somewhat illuminating are: *State* v. *Board of Phosphate*

*Commrs.*, 31 Fla. 558 [12 South. 913]; *State* v. *Black River Phosphate Co.*, 32 Fla. 82 [21 L. R. A. 189, 13 South. 640]; *State* v. *Gerbing*, 56 Fla. 603 [22 L. R. A. (N. S.), 337, 47 South. 353]; *Smith* v. *Dixie Oil Co.*, 156 La. 691 [101 South. 24]; *Wemple* v. *Eastham*, 150 La. 247 [90 South. 637]; *State* v. *Black Bros.*, 116 Tex. 615 [53 A. L. R. 1181, 297 S. W. 213]; *Taylor* v. *Commonwealth of Virginia*, 102 Va. 759 [102 Am. St. Rep. 865, 47 S. E. 875].

We are satisfied that the state act under consideration is a valid exercise of a right which inheres in the state by virtue of its sovereign power. It does not impinge upon the state or federal constitutions and is not in conflict with any act of Congress or the state of California.

Its provisions are reasonable, easily understood and no injustice will result if they are in good faith complied with. The reasons upon which respondent surveyor-general based his refusal to grant a prospecting permit to K. E. Boone, case No. S. F. 12707, being deemed insufficient, and no good cause being otherwise shown why the writ should not issue as prayed for, the prayer of petitioner Boone is granted and the surveyor-general is commanded to issue to said petitioner Boone a permit to prospect the lands described in his petition, provided said Boone has kept his tender good and stands ready to comply with the provisions of said act as herein construed.

A similar order is made as to H. E. Shudde, case S. F. No. 12708, as is directed to be entered in the Boone case. As to Charles M. Workman, S. F. No. 12728, Hickey Bros. Co. et al., S. F. No. 12729, R. W. and Thelman Harthorn et al., S. F. No. 12730, Harry A. Chamberlin, S. F. No. 12743, and Kittie C. Ballard et al., S. F. No. 12766, applicants for permits to prospect the submerged lands described in the Boone and Shudde applications, respectively, none of said applicants having shown a right superior or prior to that of Boone and Shudde, said petitions, except the petitions of Boone and Shudde, are hereby denied and the proceeding in each case is dismissed. A separate order will be filed in each case.

Richards, J., Curtis, J., Preston, J., Langdon, J., and Waste, C. J., concurred.

SHENK, J., Dissenting.—I dissent. The statute declared valid by the majority opinion throws open the entire sea coast of California (with the exception of limited areas adjacent to municipalities) for exploration and possession for the development of oil and gas by private parties. This means that from Mexico to the Oregon line a strip of tide and submerged land three miles in width and nearly 1200 miles in length, including the tide and submerged lands along the harbors, bays, estuaries, coves, inlets and navigable streams and surrounding the coastal islands, is made available for one of the purposes contemplated by the statute. In my opinion the act, in its operation as to all of said lands, is inconsistent with the trust on which the state holds title to the same for the benefit of all of the people of the state for navigation and fishery. The effect of the main opinion is to compel the surveyor-general to issue a prospecting permit and subsequent lease to any qualified person, association or corporation upon compliance with the formalities prescribed in the act. The 1923 statute (Stats. 1923, pp. 593–595) sought ineffectually to vest in the surveyor-general a discretion to refuse a permit when in his judgment the prospecting or development work would cause injury or damage to property near the land applied for, and littoral owners are, by the judgment in this case, relegated to the trial courts to adjust their rights in the first instance. This latter circumstance may be of minor importance, but it indicates the mischief engendered by the act in provoking litigation. My objection to the statute is placed on broader grounds.

It is the firmly established law of this state that the title to lands lying between the lines of ordinary high and low tide, as well as the lands within any bay and harbor and covered by its waters, is in the state, in trust, however, for the public purposes of navigation and fishery. In the early case of *Ward* v. *Mulford*, 32 Cal. 365, this court said at page 372: "The land which the state holds by virtue of her sovereignty, as is well understood, is such as is covered and uncovered by the flow and ebb of the neap of ordinary tides. Such land is held by the state in trust for the benefit of the people. The right of the state is subservient to the public rights of navigation and fishery and theoretically, at least, the

state can make no disposition of them prejudicial to the right of the public to use them for the purposes of navigation and fishery, and whatever disposition she does make of them her grantee takes them upon the same terms upon which she holds them, and of course subject to the public rights above mentioned.'' This doctrine was again declared and emphasized in the case of *People* v. *California Fish Co.*, 166 Cal. 576 [138 Pac. 79], and the series of cases in the same volume dealing with the subject. In *People* v. *California Fish Co.*, *supra*, at page 584, this court quoted with approval from *Illinois Cent. Ry. Co.* v. *Illinois*, 146 U. S. 452 [36 L. Ed. 1018, 13 Sup. Ct. Rep. 118, see, also, Rose's U. S. Notes], defining the title held by the state in trust, as follows: ''It is a title held in trust for the people of the state that they may enjoy the navigation of the waters, carry on commerce over them, and have the liberty of fishing therein freed from the obstruction or interference of private parties. . . . The control of the state for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining.'' The law of this state, as to the nature of the state's title in and to tidelands, is so definitely settled as to render unnecessary a review or citation of cases from other jurisdictions.

I am in accord with the contentions of the respondent that the proposed use of such lands is not a public use and is inconsistent with the trust under which the title to the lands is held by the state. The petitioners contend that the right to determine whether the particular use is compatible with the public right is a matter for legislative determination. I deny the right of the legislature finally to determine that all of the tide and submerged lands along the Pacific Coast of California may be used for any private purpose requiring the building of structures which would impede the free access of water craft, large or small, to the shore line or which would prevent the free use of the shores of the sea and its adjacent waters for the purpose of fishery. I am convinced that the statute in question is in excess of the powers of legislative control over such trust property. There are many authorities to the effect that in the proper exercise of legislative control limited areas of tide and

submerged lands may be set apart from the public domain in aid and promotion of the trust purposes, and even for private purposes, upon proper segregation. If it could reasonably be said that the legislature has granted to these particular petitioners the permits applied for, it might follow that the court would be bound by the implied legislative finding that the proposed use of the lands in question would not be inconsistent with the public trust. But I am unable to accede to the claim that the court is bound by an alleged implied finding of the legislature to the effect that, with no substantial impairment of the public right, all of the tide and submerged lands of the state may be used for this private purpose, which of necessity involves the building and maintenance of structures and obstructions on such lands. It is not a sufficient answer to say that the oil and gas bearing tide and submerged lands of the state are confined to very limited areas. Future development may disclose otherwise. And if all of this trust property may be set apart for one private purpose, why may it not for another? I am not impressed with the argument that if the applicants for the permits and leases do not extract the oil and gas from the state's tide and submerged lands the littoral owners may do so and the state's treasury thus be deprived of the modest royalty of five per cent. In my opinion the state should not engage in a wholesale surrender of this particularly protected public right for any such consideration or for any reason not involving a public emergency.

The tide and submerged lands of the state constitute a great public highway, whose use for navigation and fishery is analogous to that of the ordinary vehicular highway for public travel. The use of the latter is open to all well-known guaranties against obstruction for private purposes. The former should be equally available to all for navigation and fishery, excepting, of course, that where not useful for the public purpose it may be altered to meet changing conditions and in a way not inconsistent with the trust. As to the right of fishery, no one may successfully maintain that the tidal waters will not be contaminated by the proposed operations and the fish be driven to deeper channels. The statute does not contemplate that the waters of the ocean will not be so despoiled. The act only requires that the permittees and lessees ''use all reasonable precautions to pre-

vent waste of oil or gas developed in the land." It is argued that the necessary structures to be built upon the trust property will not prevent reasonable access to the leased lands by those members of the public who may desire to navigate the waters over the leased lands or to fish therein. If this be true, it is so from a theoretical standpoint only. From a practical standpoint I believe that the occupation of lands under such a lease and operations thereunder would effect a substantial deprivation of the public right of navigation and fishery, just as an obstruction in a public highway would impede public travel.

It is claimed that, because of the expanse of the state's coast line, the applications for permits involved herein are of relative unimportance. The answer is that the main opinion establishes the rule as to *all* of the tide and submerged lands held by the state. My objection goes to what may be done under the statute and to relegating the entire question to one of legislative policy.

A rehearing was denied on January 28, 1929, and the following opinion then rendered thereon:

THE COURT.—The petitions for rehearings herein are denied. The record herein, as presented by the pleadings and by the briefs of the parties to these several proceedings, shows that every question of law involved in each and all thereof was finally submitted to this court for decision and has been properly decided; that as to any issues of fact which have arisen in the course thereof, the determination of these depended upon matters of record in the offices of state officers, or were matters of which the court could take judicial knowledge without the necessity of a reference and that the decision in all of these matters was embraced in the order of submission herein and has been properly and fully determined by the decision heretofore filed herein. We are satisfied that the decision on the question of littoral rights, wherein such rights were made an issue in the respective petitions, conforms to and follows the decisions of the United States supreme court and our own court on said question. This question was argued and given full consideration in our opinion.